**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| KATHY CRAIG and GARY CRAIG, individually and as successors-in-interest to BRANDON LEE WITT, deceased, | Case No.: SACV 17-00491-CJC(KESx) |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Dkt. 76] |
| v. | |
| COUNTY OF ORANGE, NICHOLAS PETROPULOS, an individual, and DOES 1–10, inclusive, | |
| Defendants. | |

## I.  INTRODUCTION

Plaintiffs brought this civil rights action after their son, Brandon Lee Witt, was shot at close range by an Orange County Sheriff's Deputy while Witt was in his car in the

parking lot of an Extended Stay America in Yorba Linda, California.  Before the Court is Defendants' motion for summary judgment.  (Dkt. 76 [hereinafter "Mot."].)  For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.[1]

## II.  BACKGROUND

On February 15, 2016, around 12:45 p.m., Orange County Sheriff's Deputy Nicholas Petropulos was on routine patrol at the Extended Stay America in Yorba Linda, California.  (Dkt. 90 [Defs.' Reply Separate Statement of Uncontroverted Facts, hereinafter "UF"] 1; Dkt. 77 [Declaration of Nicholas Petropulos, hereinafter "Petropulos Decl."] ¶ 27.)  He was not responding to any particular service call, but the area was known for narcotics use and transactions.  (UF 1; Dkt. 91 [Defs.' Reply to Pls.' Additional Evidence, hereinafter "AUF"] 40.)  While on patrol at the hotel, Deputy Petropulos noticed an individual, who was later identified as Brandon Lee Witt.  (UF 1–2.)  Witt was sitting in a vehicle in the parking lot and talking to a man who was standing outside the vehicle.  (UF 1.)  The vehicle had no front license plate.  (*Id.*)  Failure to display a front license plate is an infraction of the vehicle code.  (AUF 43.)

When Deputy Petropulos's patrol car passed the two men, the man talking to Witt stared at Deputy Petropulos.  (UF 2.)  Deputy Petropulos drove to the front of the hotel parking lot to see if the men would leave.  (UF 3.)  When the men did not leave, he went back to the location in the parking lot where they had been.  (*Id.*)  By the time Deputy Petropulos returned, Witt had moved his vehicle to another parking space.  (*Id.*)  Deputy Petropulos parked his patrol car near Witt's vehicle.  (UF 4.)  Deputy Petropulos noticed

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for March 11, 2019 at 1:30 p.m. is hereby vacated and off calendar.

that a woman had joined the man with whom Witt had been speaking, and the man and woman were now located a couple of parking spaces away.  (*Id.*)

Deputy Petropulos approached Witt's car.  (UF 5.)  Deputy Petropulos had never seen Witt before and he had no information about Witt's criminal history or whether he was on probation or parole.  (AUF 44–46.)  Deputy Petropulos initiated a consensual encounter with Witt.  (AUF 48.)  Deputy Petropulos's dash cam captured audio for the entirety of his conversation with Witt, although some portions are incomprehensible and the parties dispute exactly what was said.  (*See* Dkt. 82 Ex. D [Enhanced and Combined Audio and Video, hereinafter "ECAV"]; *see also* Dkt. 87-1 Ex. BBB [Notated Transcript of Audio of Petropulos's Dash Cam Recording, hereinafter "Incident Tr."].)  Deputy Petropulos approached Witt and asked him what he was doing.  (UF 6.)  Witt told Deputy Petropulos that he was in the middle of moving.  (AUF 52.)  Deputy Petropulos then asked if Witt had any identification and whether he was on probation or parole.  (UF 6.)  Witt said he did not have any identification and that he was not on probation or parole.  (*Id.*)

Deputy Petropulos asked Witt whether he knew the man and woman in the parking lot.  (*Id.*)  Witt responded that he did not.  (*Id.*)  Deputy Petropulos told him to turn his car off.  (*Id.*)  Witt's car, a Toyota Avalon, was full of a myriad of items.  (UF 5.)  Deputy Petropulos asked Witt about the contents of the car: "Anything I need to worry about?"  (AUF 53.)  Witt replied, "Not at all."  (AUF 53.)  Deputy Petropulos repeated his command to turn the car off.  (UF 6.)  At that point, Witt displayed a pen-like metal tool, which was apparently used to manipulate the vehicle's ignition.  (*Id.*; AUF 150.)  Deputy Petropulos told him to drop it and step out of the car.  (UF 6.)  Witt placed the metal item on the center console near the gear shifter.  (AUF 76.)  Deputy Petropulos asked Witt if the Toyota Avalon was his car.  (Incident Tr. at 8.)  Witt said it was.  (*Id.*)  Deputy Petropulos told Witt to keep his hands on the wheel.  (UF 6.)  Witt's response is

inaudible.  Deputy Petropulos then said to him, "You had no front plate on the car when I looked at it earlier."  (Incident Tr. at 8.)  Witt responded, "It's right here. I had --."  (*Id.* at 9.)

Around that point, the woman in the parking lot approached Witt and asked for a baby bottle.  (UF 6.)  Deputy Petropulos said to her, "What?  Do you know him?  Any reason he would tell me he didn't know you a second ago?"  (*Id.*)  Her responses are inaudible.  (*See* Incident Tr. at 9.)  Deputy Petropulos then turned to Witt, "Why would you lie, bro?"  (*Id.*)  Witt's responses are mostly inaudible.  (*See id.*)  Deputy Petropulos then said, "All right.  Do me a favor.  Open the door slowly.  I'm going to have you step out, man."  (*Id.* at 9–10.)  Witt seems to ask Deputy Petropulos if he had a reason for this.  (*See id.* at 10.)  Deputy Petropulos responded, "Yes, I don't like the way you're acting right now.  I haven't confirmed your ID, anything like that.  I think you're lying to me."  (*Id.*)  Witt responded, "I can give you all the information you need."

Deputy Petropulos continued to ask Witt to step outside of the car.  (*Id.* at 10–11.)  Witt tried to explain that he had some incident with someone pretending to be a police officer about six months ago.  (*Id.* at 10–14.)  Witt asked Deputy Petropulos if he could verify his identity.  (*Id.* at 11.)  Deputy Petropulos responded, "You can step out of the car and do as you're told, man."  (*Id.*)  Witt told him he had no jurisdiction.  (*Id.*)  Deputy Petropulos replied that he was with the Orange County Sheriff's Department and they were in the city of Yorba Linda.  (*Id.*)  Witt asked if he could call Deputy Petropulos's sergeant.  (*Id.* at 12.)  Deputy Petropulos responded, "Get out of the car.  I'll get him here for you."  (*Id.*)  Deputy Petropulos then continued to ask Witt to keep his hands on the wheel and keep his hands outside of the car.  (*Id.*)  Witt said, "I'm going to call 911 and (inaudible) can I call your sergeant?  I'm going to call your sergeant."  (*Id.* at 13.)  At one point, Witt had a cell phone in his hand, but he dropped it when ordered by Deputy

Petropolus.  (AUF 64.)  Petropolus ran Witt's license plate and it came back current for a four-door Toyota, registered to Brandon Witt out of Corona.  (AUF 66.)

Deputy Petropolus then asked for Witt's name.  Witt gave him his full name, birthday, and social security number.  (AUF 67–68; Incident Tr. at 13.)  Deputy Petropolus then said, "You're (inaudible) how this is going right now." (*Id.*)  Witt's response is inaudible.  (*Id.*)  Deputy Petropolus then said, "I asked you to step out of the vehicle.  You're lucky that I haven't ripped you out right now." (*Id.*)  Deputy Petropolus continued to tell Witt not to move his hands.  (*Id.* at 14.)  After some time, Witt seemed to repeat his earlier request for Deputy Petropolus to identify himself.  (*See id.* at 15.)  Deputy Petropolus responded with his name and badge number.  (*Id.*)  He told Witt, "They're coming right now." (*Id.*)  The two continued to speak back and forth:

> DEPUTY PETROPOLUS:  Put your hands over here.
> WITT:  Hey, there's no need to touch me like that.  Come on.  I --
> DEPUTY PETROPOLUS:  You're reaching in --
> WITT:  (Inaudible.)
> DEPUTY PETROPOLUS:  Dude, I swear to God.
> WITT:  Look, stop.  Why are you assaulting me?  Why are you assaulting me?  Come on, man.  Look, I stopped -- I stopped, all right.
> DEPUTY PETROPOLUS:  104, I'm going to (inaudible) Code 3.[2]  I'm going to shoot you (inaudible).
> WITT:  No.
> DEPUTY PETROPOLUS:  I'm going to fucking shoot you.  Put your hands outside of this fucking car.
> WITT:  Okay.  Let me get out -- let me get out -- let me get out.
> DEPUTY PETROPOLUS:  Put your hands outside of the fucking car.
> WITT:  All right.  They're out.  They're out.  Let me get out.
> DEPUTY PETROPOLUS:  You just tried to (inaudible).[3]
> WITT:  No, I did not.  I swear -- I'm scared -- I'm scared.  Okay.  I'm scared.

---

[2] "Code 3" means there is an emergency and the deputy needs assistance as soon as possible.  (Dkt. 77 [Declaration of Brian Callagy] ¶ 6.)

[3] Defendants contend that Deputy Petropolus said, "You just tried to go to fucking 'drive.'" (*See* Incident Tr. at 16.)

DEPUTY PETROPOLUS:  I will shoot you if you throw that car in fucking drive again.

WITT:  Okay.  All right.  I'm scared.

DEPUTY PETROPOLUS:  Just keep your hands outside the fucking window.

WITT:  Officer --

DEPUTY PETROPOLUS:  You think I'm joking right now.

WITT:  But I've been shot before, sir.

DEPUTY PETROPOLUS:  Okay.  I'm not going to shoot you as long as you fucking listen.

WITT:  All right.  All right.  Yes, sir.  Can you ask the girl to tell -- tell you whatever information.

DEPUTY PETROPOLUS:  They're coming right now.

WITT:  Okay, that's fine.  I'll stay right here.

DEPUTY PETROPOLUS:  Stay right there.  I'm not taking my hands off you.  Dude, keep your hands where I can fucking see them.

(*Id.* at 15–17.)  The parties dispute the exact chronology, but some time during this exchange Deputy Petropolus placed his hands on Witt's wrists while they were outside the car, holding them there.  (AUF 87.)  When Witt attempted to pull his arms and hands back into the vehicle, Deputy Petropolus maintained his grip and partially went inside the vehicle's open window.  (AUF 88.)  Witt broke free of Petropolus's grip.  (AUF 90.) Deputy Petropolus leaned in through the open window, placed his right arm across Witt's body in a seatbelt-like fashion, and tried to gain control of Witt's right hand.  (AUF 91.) At some point during this struggle, Deputy Petropulos drew his firearm.  (AUF 93.)

Deputy Brian Callagy then arrived at the scene in his patrol car.  (ECAV at 8:52.) Deputy Callagy noticed that the Toyota's reverse lights were on.  (UF 17.)  He parked so that his police car's front bumper touched Witt's car's rear bumper.[4]  (*Id.*)  When Deputy Callagy arrived, Deputy Petropolus reholstered his gun.  (AUF 101.)  Deputy Petropolus again reached into the vehicle.  (AUF 103.)  He commanded Witt to put his car in park.

---

[4] Plaintiffs contend Deputy Callaghy's car collided with the back of Witt's car, whereas Defendants assert he "placed" his car there.  (*See* UF 17.)

(Incident Tr. at 17.)  Deputy Callagy attempted to assist Deputy Petropolus in controlling Witt's hands.  (UF 21.)  The video footage shows Witt's vehicle moving forward and backward.  (*See* ECAV at 9:00–9:18.)  During the struggle, Witt yelled, "I've been assaulted -- I've been assaulted before."  (Incident Tr. at 17.)  Deputy Petropolus responded, "Stop fucking reaching around.  You're going to get shot."  (Incident Tr. at 18.)  Deputy Petropolus then unholstered his gun and pointed it at Witt.  (ECAV at 9:09–9:11.)  The conversation escalated:

> DEPUTY PETROPOLUS:  You're going to get shot, motherfucker.
> WITT:  No, please.  Please, don't.
> DEPUTY PETROPOLUS:  Put it in park.
> WITT:  Please don't (inaudible).
> DEPUTY PETROPOLUS:  (Inaudible.)
> WITT:  I just been shot -- I been shot.
> DEPUTY PETROPOLUS:  Put the car in park then -- in park and listen.
> WITT:  No, please, don't -- please.
> DEPUTY PETROPOLUS:  I'm going to fucking --
> WITT:  (Inaudible.)

(Incident Tr. at 18.)  During this exchange, Witt's car moved back and forth as he apparently shifted the gear from reverse to drive and back again.  (AUF 141.) Defendants contend that Deputy Petropolus could not see Witt's right hand as he continued reaching down between the driver's seat and the console area.  (UF 24.) Plaintiffs contend that during this struggle, Deputy Petropolus lost control of Witt's right hand for only thirty seconds, and during that thirty-second period, he could still see Witt's right hand at certain points.  (Dkt. 83-1 Ex. A [Deposition of Nicholas Petropulos, hereinafter "Petropolus Dep."] at 62:20–63:1, 63:11–13.)  Plaintiffs also assert that Deputy Petropolus never saw a weapon on the vehicle's floor, seat, or center console area, or on Witt's person.  (*Id.* at 64:15–65:7.)  Deputy Callagy did not see any weapon on Witt's person or anything in his hands.  (Dkt. 83-2 Ex. B [Deposition of Brian Callagy, hereinafter "Callagy Dep."] at 13:21–23, 14:6–8.)

Then, Witt's car moved five feet forward, away from the deputies, at about five miles per hour, causing Deputy Petropolus to collide with Deputy Callagy, and in turn causing Deputy Callagy to stumble and turn away.  (UF 22; AUF 163–64.)  When Deputy Callagy turned away, he saw nothing in Witt's right hand.  (AUF 146.)  Deputy Petropolus could see Witt's left hand on the steering wheel, but Witt's right hand went out of Deputy Petropolus's view for two to five seconds.  (AUF 143, 147.)  Deputy Petropolus was standing on the side of the vehicle, so he was not in front or in the direct path of the vehicle.  (AUF 167.)  Witt's right hand was apparently out of Deputy Petropolus's view.  (UF 26.)  From the video and audio recording, it seems Deputy Petropolus said, "Fuck it."  (ECAV at 9:21.)  He then fired one round at Witt.  (*Id.* at 9:23; UF 26; AUF 145.)

The car moved forward into the bushes and came to a stop in a drainage area.  (UF 27.)  The tires kept spinning, burning rubber and creating smoke.  (*Id.*)  Deputies Petropolus and Callagy kept their distance because they could not tell Witt's condition and they feared an ambush if they approached.  (UF 28.)  After the smoke cleared and backup deputies arrived, Witt was removed from the vehicle.  (UF 29.)  The deputies initiated first aid, and paramedics arrived shortly thereafter.  (UF 29.)  Witt died as a result of the gunshot.

On March 17, 2017, Plaintiffs Gary Craig and Kathy Craig, Witt's biological parents, filed this action against Defendants County of Orange and Deputy Petropolus in federal court.  (Dkt. 1.)  Plaintiffs assert causes of action for (1) unreasonable search and seizure, (2) excessive force, (3) violation of substantive due process, (4) battery, (5) negligence, and (6) violation of the Bane Act, Cal. Civ. Code § 52.1(b).[5]  (*See* Dkt. 37 [Third Amended Complaint].)

---

[5] Plaintiffs voluntarily dismissed their claims for denial of medical care and *Monell* liability under 42 U.S.C. § 1983.  (Dkt. 75.)

### III.  LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law.  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*, 477 U.S. at 325.  Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the

moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position.  Fed. R. Civ. P. 56(c)(1)(A)–(B).  The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]."  *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor.  *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).  The court does not make credibility determinations, nor does it weigh conflicting evidence.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).  But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment.  *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  The evidence the parties present must be admissible.  Fed. R. Civ. P. 56(c).  "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g).

//

# IV.  DISCUSSION

## A.     Section 1983 Claims

Under section 1983, "[e]very person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.  To establish a right to recovery under section 1983, the plaintiff must prove that the defendant "(1) deprived [him] of a right secured by the Constitution, and (2) acted under color of state law."  *Collins v. Womancare*, 878 F2d 1145, 1147 (9th Cir. 1989).  Plaintiffs bring claims for unlawful detention and arrest, excessive force, and deprivation of substantive due process against Deputy Petropulos.

### a.      Unlawful Detention and Arrest

Plaintiffs allege that Deputy Petropulos unlawfully detained and arrested Witt. Both parties agree that Deputy Petropulos's initial encounter with Witt was consensual. (*See* AUF 48.)  Law enforcement officers do not violate the Fourth Amendment by approaching an individual on the street or other public place, asking for identification, and posing a few questions to the individual.  *See United States v. Mendenhall*, 446 U.S. 544, 555 (1980).  Similarly, Deputy Petropulos did not violate the Fourth Amendment by approaching Witt and asking what he was doing, if he had identification, and if he was on probation or parole.

Plaintiffs contend that Deputy Petropulos detained Witt immediately by parking his car perpendicular to Witt's car and by asking Witt questions.  A person is only "seized" within the meaning of Fourth Amendment, however, when "his freedom of

movement is restrained," either "by means of physical force or a show of authority." *Id.* at 553.  "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy." *Id.* at 554.  The undisputed facts indicate that Deputy Petropolus did not immediately detain or "seize" Witt.  He parked his car perpendicular to Witt's car and began to ask him questions, but Witt remained free to disregard the questions and walk away.

When Deputy Petropolus first told Witt to turn off his car, however, it is possible that a reasonable person would no longer feel free to end the conversation and proceed on his way.  (*See* UF 6.)  A police officer may conduct a brief stop for investigatory purposes so long as the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts," form the basis for suspecting that the particular person to be detained is engaged in criminal activity.  *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968).  This assessment is judged from an objective standard, asking whether the facts available to the officer would "warrant a man of reasonable caution in the belief that the action taken was appropriate."  *Id.* at 21–22.

The undisputed facts establish that Deputy Petropolus had reasonable suspicion to briefly detain Witt by the time he asked Witt to turn his car off.  The parking lot in which Witt was located was well known for criminal activity.  (UF 1.)  When Deputy Petropolus first drove by Witt's car, the car was missing its front license plate, which is an infraction of the vehicle code.  (UF 1; AUF 43.)  Witt then moved his car and left it running when Deputy Petropulos approached.  (UF 3, 6.)  And when Deputy Petropolus asked Witt if he had identification, Witt told him he had none, providing grounds for Deputy Petropolus to suspect that Witt had committed the misdemeanor of driving without a license, in violation of California Vehicle Code § 12500.  (*See id.*)  Deputy Petropolus also noticed that Witt spoke rapidly, had rigid muscles, moved his hands

restlessly, and demonstrated other agitated behavior, which are symptoms associated with being under the influence of a stimulant drug.  (UF 7.)  Witt's car was filled with all kinds of personal items, which is another sign of methamphetamine abuse.  (UF 8.)  Together, all these facts provided reasonable suspicion that Witt was engaged in criminal activity.

To subsequently arrest Witt without a warrant, there must have been probable cause.  *Michigan v. Summers*, 452 U.S. 692, 700 (1981).  "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  In other words, probable cause exists when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime."  *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986).  Probable cause is an objective standard.  *Lopez*, 482 F.3d at 1072.  "While conclusive evidence of guilt is of course not necessary[,] . . . mere suspicion, common rumor, or even strong reason to suspect are not enough."  *Id.* (internal quotation marks and citation omitted).

As the encounter developed, the undisputed facts indicate that Deputy Petropolus had probable cause to arrest Witt.  When Deputy Petropolus asked Witt to turn off his car, Witt produced a pen-like metal tool, which was apparently used to manipulate the vehicle's ignition.  (UF 6; AUF 150.)  Based on this tool, Deputy Petropolus suspected that the car was stolen.  Although several minutes later dispatch informed Deputy Petropolus that the car was registered to Witt, by that point Deputy Petropolus had learned even more information to establish probable cause to arrest Witt.  When Deputy Petropolus first approached Witt, Witt claimed not to know the woman two spots away from his vehicle.  (UF 6.)  This woman, however, then approached Witt to ask for a baby

bottle, suggesting that they did know each other.  (*Id.*)  Based on this, Deputy Petropolus had reason to believe Witt had violated California Vehicle Code § 31 by giving false information to a police officer.  Deputy Petropolus also gave Witt multiple commands to exit his vehicle, keep his hands visible, or put his car in park.  Witt later physically resisted Deputy Petropolus's and Deputy Callagy's efforts to restrain his hands.  By these actions, Deputy Petropolus had probable cause that Witt violated California Penal Code § 148 (resisting arrest), California Penal Code § 243(b) (battery on a peace officer), California Penal Code § 242 (battery), and California Penal Code § 240 (assault).  Since there is no dispute of material fact as to whether Witt's detention and arrest were reasonable, Defendants' motion for summary judgment is **GRANTED**.[6]

### b.    Excessive Force

Plaintiffs assert a claim for excessive force against Deputy Petropulos.  To determine whether force was excessive under the Fourth and Fourteenth Amendments, courts employ an objective standard: the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.").  Courts assess reasonableness using the nonexhaustive *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  The most important factor is whether the suspect posed an immediate threat.  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).  Deadly force is

---

[6] Accordingly, the Court need not address whether Deputy Petropulos is entitled to qualified immunity on Plaintiffs' unreasonable search and seizure claim.

reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  However, where the reasonableness of the officer's conduct turns on disputed issues of material fact, the question is one that should be left for the jury. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

There is a dispute of material fact as to whether Witt posed an immediate threat to Deputy Petropulos or Deputy Callagy.  Detective Petropulos stated that just before the shooting, he could not see Witt's right hand and feared Witt might grab a weapon. (Petropulos Decl. ¶ 24.)  But where the only witness—other than the officers—was killed during the encounter, the Court must "carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts."  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014).  Based on the record, a jury could reasonably find that Witt did not pose an immediate threat. Neither officer saw a gun or weapon on the vehicle's floor, seat, or center console area, or on Witt's person.  (Petropulos Dep. at 64:15–65:7; Callagy Dep. at 13:21–23, 14:6–8.) Witt never verbally threatened the officers, and they had no reports that he was armed or had committed a crime.  (AUF 77; Petropulos Dep. at 8:20–22, 50:22–25; Callagy Dep. at 14:9–11.)  Witt was arguably trying to flee the officers at the time he was shot. Defendants have failed to show that there are no questions of fact regarding whether the use of deadly force was reasonable.  *See Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 538 (9th Cir. 2010) (finding court properly denied summary judgment on excessive force claim where decedent had not been accused of any crime, had not initially caused the situation, and did not brandish, mention, or threaten to use a weapon).

The moments just before the firing are also disputed.  Deputy Callagy testified that he did not see anything in Witt's right hand in the one to three seconds before he turned away from the vehicle, just before Deputy Petropulos fired.  (AUF 146.)  Deputy

Petropolus contends he lost control of Witt's hands for about thirty seconds, but acknowledges that he could still see Witt's hands at points during those thirty seconds. (Petropolus Dep. at 62:20–63:1, 63:11–13.)  And if Deputy Callagy could see Witt's right hand just seconds before the gun was fired, a jury could find that Deputy Petropulos also saw nothing in Witt's right hand in the seconds before he fired.  Defendants have failed to prove there is no dispute of material fact on Plaintiffs' excessive force claim.

### c.   Substantive Due Process

Plaintiffs allege that Deputy Petropulos violated their substantive due process rights under the Fourteenth Amendment.  Plaintiffs contend that Deputy Petropulos's conduct during his confrontation with Witt deprived them of their liberty interest in the "companionship and society" of their son.  *See Wilkinson v. Torres,* 510 F.3d 546, 554 (9th Cir. 2010) (recognizing the fundamental liberty interest of parents and children in the "companionship and society" of the other).

"Police conduct violates due process if it 'shocks the conscience.'"  *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (quoting *Porter v. Osborg*, 546 F.3d 1131, 1137 (9th Cir. 2008)).  An officer's actions shock the conscience if the officer acts with (1) "deliberate indifference" or (2) a "purpose to harm . . . unrelated to legitimate law enforcement objectives."  *Id*. (quoting *Porter*, 546 F.3d at 1137).  The lower "deliberate indifference" standard applies to circumstances where "actual deliberation is practical."  *Wilkinson*, 610 F.3d at 554.  However, where an officer "makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."  *Id*.  "Legitimate law enforcement objectives [include] arrest, self-defense, or the defense of others."  *A.D*., 712 F.3d at 454.  A purpose to harm might be found where an officer uses force to bully a suspect or "get even."  *Wilkinson*, 610 F.3d at 554.

The undisputed facts here indicate that actual deliberation was impractical.  In *Porter v. Osborn*, the Ninth Circuit held the purpose-to-harm standard applied where the incident rapidly escalated over five minutes, forcing officers to make "repeated split-second decisions."  546 F.3d 1131, 1137–39 (9th Cir. 2008) (quoting *Bingue*, 512 F.3d at 1176).  *Osborn* involved a situation where officers attempted to remove a suspect from his car, creating "an evolving set of circumstances that took place over a short time period necessitating 'fast action' and presenting 'obligations that tend to tug against each other.'"  *Id.* at 1139.  Once the suspect began acting evasively, the officers had to react quickly, so actual deliberation was impractical.  *Id.* at 1140.  The case here involves similar circumstances.  The video footage indicates the whole encounter lasted around eight minutes from the time Deputy Petropolus approached Witt to the time he fired his gun.  As Witt continued to disobey Deputy Petropulos's commands, however, Deputy Petropulos had to react quickly.  Witt shuffled through items in his car and repeatedly shifted the car into drive and reverse.  (AUF 141; UF 24.)  Just before the shooting, Witt suddenly drove the car forward, knocking the deputies into each other.  (UF 22; AUF 163–64.)  Since Deputy Petropulos had to make a "snap judgment" due to "an escalating situation," the purpose-to-harm standard applies.  *A.D.*, 712 F.3d at 454; *see also Porter*, 546 F.3d 1131, 1137–39.

Applying the purpose-to-harm standard and viewing the evidence in a light most favorable to Plaintiffs, there remains a dispute of material fact as to whether Deputy Petropulos acted with a legitimate law enforcement objective.  The video and audio recording show that Deputy Petropulos grew increasingly agitated and irate towards Witt.  A jury could find that when Witt challenged Deputy Petropulos's authority and asked to confirm his identity and talk with a sergeant, Deputy Petropulos felt disrespected and wanted to get even.   A jury could also find that Deputy Petropulos wanted to teach Witt a lesson for disobeying his orders to turn the car off and get out of the car.  A reasonable factfinder could find that Deputy Petropulos's own words convey a desire to teach Witt a

lesson, as he told Witt: "I will shoot you if you throw that car in fucking drive again," "I'm not going to shoot you as long as you fucking listen," "You're going to get shot, motherfucker," and ultimately, "Fuck it," before he pulled the trigger.  (Incident Tr. at 16–18; ECAV at 9:21.)

Plaintiffs also offer evidence that casts doubt on Deputy Petropolus's assertion that he acted in self-defense.  The video recording indicates that Deputy Petropolus shot at Witt as the car was moving away from the officers and into the bushes.  (AUF 167; *see also* ECAV at 9:21–23.)  The officers never saw any gun or weapon in the car or on Witt's person, except for a pen-like metal object used to start the car, which Witt had placed on the center console.  (Petropulos Dep. at 64:15–65:7; Callagy Dep. at 13:21–23, 14:6–8; UF 6; AUF 76, 150.)  Defendants have failed to prove that there is no dispute of material fact as to whether Deputy Petropolus deprived Plaintiffs of their substantive due process rights.

### d.    Qualified Immunity

Defendants assert that Deputy Petropulos is entitled to qualified immunity on Plaintiffs' section 1983 claims.  (Mot. at 22–25.)  Qualified immunity shields public employees from civil liability under section 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether a public employee is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the employee's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  As noted above, a jury could reasonably conclude that Deputy Petropulos's conduct violated Witt's and Plaintiffs' constitutional rights.

"To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood *what he is doing* violates that right." *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016) (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015)) (per curiam) (emphasis in *Hamby*). "Although a plaintiff need not find 'a case directly on point, existing precedent must have placed the . . . constitutional question beyond debate.'" *Id.* at 1091 (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2001)). The Court must make its inquiry "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As to Plaintiffs' substantive due process claim, it was clearly established law on February 15, 2016 that "a police officer who act[s] with the purpose to harm a civilian, unrelated to the legitimate law enforcement objectives of arrest, self-defense, or the defense of others, violate[s] the Fourteenth Amendment due process clause." *A.D.*, 712 F.3d at 454. The Ninth Circuit has stated that this standard is so "obvious" that qualified immunity is inapplicable even without a case directly on point. *Id.* at 455. For the reasons already stated, the evidence supports a reasonable inference that Deputy Petropulos acted with a purpose to harm that was unrelated to legitimate law enforcement objectives. A reasonable jury could find that Deputy Petropulos wanted to teach Witt a lesson about questioning a police officer's authority and disobeying his commands. Consequently, Deputy Petropulos is not entitled to qualified immunity on Plaintiffs' substantive due process claims.

With respect to Plaintiffs' excessive force claim, it was clearly established on the day of the incident that deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Accepting Plaintiffs' version of the facts, the circumstances here parallel those evaluated by the Ninth Circuit in *Haugen*

*v. Brosseau*, 351 F.3d 372 (9th Cir. 2003), *rev'd on other grounds*, 543 U.S. 194 (2004).

In *Haugen*, a police officer shot a suspect through the window of a car as he appeared to

reach for something.  *Id.* at 383.  *Haugen* held that "[m]ovements by a suspect are not

enough to justify deadly force if, in light of the relevant circumstances, those movements

would not cause a reasonable officer to believe that the suspect was reaching for a

weapon."  *Id.*  Similarly, it is disputed whether Witt's movements alone provided an

objectively reasonable reason to use deadly force, particularly where the officers did not

see any gun or weapon, the officers had no information that Witt was armed, Witt never

verbally threatened the officers, and Witt was attempting to move away from the officers

at the time Deputy Petropolus fired.  Courts have repeatedly held that it is not objectively

reasonable to use deadly force where decedents did not have weapons on their persons,

brandish weapons, or threaten to use them.[7]  *See Harris v. Roderick*, 126 F.3d 1189, 1203

(9th Cir. 1997) (holding a shooting was not objectively reasonable where suspect was

attempting to flee officers and made "no threatening movement of any kind"); *Curnow v.

Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (finding it was clearly established

law that officers could not use deadly force to shoot a suspect who was not pointing a gun

at the officers and was not facing them).

Defendants argue that Plaintiffs' reliance on *Haugen* is misplaced because the

Ninth Circuit's analysis was conducted pursuant to *Garner*, not *Graham*.  (Dkt. 86

[Reply] at 24.)  Defendants contend that *Haugen* "occupies a completely separate Fourth

Amendment category from cases that must be examined under *Graham*."  (*Id.*)

Defendants offer no authority for this assertion.  In *Garner*, the Supreme Court analyzed

---

[7] Defendants cite a number of out-of-circuit cases for the proposition that an officer does not need to wait to see a gun before firing.  *See, e.g.*, *Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991); *Martin ex rel. Webb v. City of Newark*, --- Fed. App'x ----, 2018 WL 6828424, at *4 (3d Cir. Dec. 28, 2018).  However, the key issue is still whether it was objectively reasonable for the officers to believe that Witt posed an immediate threat of serious physical harm, particularly where they never saw a weapon.  Since there is a dispute of material fact on this point, the Court cannot grant summary judgment on the basis of qualified immunity.

whether the use of deadly force to apprehend a fleeing suspect violated the suspect's rights by referencing the Fourth Amendment's "reasonableness" standard. 471 U.S. at 5, 7–8. Four years later in *Graham*, the Supreme Court made explicit what was implicit in *Garner*, holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395. Both *Graham* and *Garner* involve applications of the Fourth Amendment's reasonableness inquiry. They do not, as Defendants seem to suggest, create one standard that applies to suspects that flee and another standard that applies to other situations.

Defendants attempt to distinguish *Haugen*, claiming it involved a case where the suspect was fleeing and the officer was out of harm's way. However, as discussed previously, there is a dispute of material fact as to whether Witt was fleeing and whether the officers were out of harm's way. A jury could reasonably find that Witt was attempting to flee by putting the car into reverse and then drive. A jury could also find that Witt was not an immediate threat to the officers. Accordingly, the officers are not entitled to qualified immunity on summary judgment of Plaintiffs' excessive force claim. *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) (stating that "where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate").

### B.     State Law Claims

Plaintiffs also assert causes of action for battery, negligence, and violation of California Civil Code § 52.1(b). Defendants first move for summary judgment on the ground that Deputy Petropolus's use of force is not excessive as a matter of law. While a

police officer may use reasonable force to affect an arrest, to prevent escape, or to overcome resistance, he may not use excessive force.  *See* Cal. Penal Code § 835; *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 264 (1967).  Law enforcement's use of deadly force may also give rise to negligence liability if "the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable."  *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 626 (2013).  Similarly, an excessive force claim under California Civil Code § 52.1(b) requires a plaintiff to prove that the use of force was unreasonable.  *See Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1041–44 (9th Cir. 2018).  As discussed above, there is a dispute of material fact as to whether Detective Petropolus's use of deadly force was reasonable.

Defendants move for summary judgment on Plaintiffs' negligence claim to the extent that the claim is premised on Deputy Petropolus's pre-shooting conduct. Defendants cite to *Hernandez v. City of Pomona*, where the court held that plaintiffs could not base their negligence claim based on the way that officers executed a high-speed pursuit, since the actual injury occurred after the officers exited their cars.  46 Cal. 4th 501, 519–20 (2009).  Defendants offer little explanation for how *Hernandez* applies to this case.  And in *Hernandez*, the use of force was found to be reasonable.  *Id.* at 518. In contrast, here, it is a disputed issue of material fact as to whether the use of force was reasonable.  Moreover, it is a "long-established principle of California negligence law that a peace officer's conduct must be determined in light of the totality of the circumstances," including pre-shooting conduct.  *See Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1235–36 (9th Cir. 2013) (reversing district court's finding that the deputies owed no duty of reasonable care with regard to their pre-shooting conduct).

//

Defendants move for summary judgment on Plaintiffs' section 52.1 claim on the basis that there is no evidence that Petropulos had a specific intent to recklessly disregard and violate Witt's rights.  Recently, the Ninth Circuit has interpreted the Bane Act to require proof of a specific intent to violate the arrestee's right to freedom from unreasonable seizure, in addition to proof of a constitutional violation.  *See Reese*, 888 F.3d at 1043–44.  Plaintiffs have presented sufficient evidence to create a dispute of material fact as to whether Deputy Petropolus had a specific intent to violate Witt's constitutional rights.  Deputy Petropolus's escalating temper, repeated threats to shoot Witt, and his ultimate firing of the weapon at Witt at point blank range create a triable issue of fact on Deputy Petropolus's specific intent.  Accordingly, Defendants' motion for summary judgment on the state law claims is **DENIED.**

//

**V.  CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.[8]  Defendants' motion for summary judgment on the unreasonable search and seizure (first) cause of action is **GRANTED**. Defendants' motion for summary judgment on the excessive force (second), substantive due process (fifth), battery (sixth), negligence (seventh), and Bane Act (eighth) causes of action is **DENIED**.

DATED:    March 7, 2019

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[8] Plaintiffs object to the admission of Vina Spiehler's declaration and Eric Hatch's declaration.  (Dkt. 84-2.)  Defendants object to Exhibits C, E, F, G, and H to the Declaration of Melanie T. Partow.  (Dkt. 88.)  Since the Court does not rely on this evidence, it need not address the parties' objections. Defendants also ask the Court to take judicial notice of numerous state court records reflecting Witt's criminal history.  (Dkt. 78.)  Defendants argue that Plaintiffs have opened the door to this evidence by placing Witt's subjective state of mind at issue, particularly by contending that his conduct was based on fear.  Plaintiffs object.  (*See* Dkt. 84-2.)  Because Witt's subjective state of mind is irrelevant to that part of the Court's decision to deny Defendants' motion, Defendants' request for judicial notice is DENIED.