**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| **KATHY CRAIG, et al.,**<br><br>        **Plaintiffs,**<br><br>    **v.**<br><br>**COUNTY OF ORANGE, et al.,**<br><br>        **Defendants.** | **Case No.: SACV 17-00491-CJC(KESx)**<br><br><br>**ORDER DENYING DEFENDANTS' MOTION TO ALTER JUDGMENT TO VACATE DAMAGES FOR LOSS OF LIFE [Dkt. 216] AND DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW [Dkt. 215]** |

## I.  INTRODUCTION

This case arises out of the fatal shooting of Brandon Lee Witt by Orange County Sheriff's Deputy Nicholas Petropulos while Witt was sitting in his car in a hotel parking lot in Yorba Linda, California.  On March 17, 2017, Witt's parents, Plaintiffs Kathy

Craig and Gary Witt, filed this lawsuit in federal court against Defendants County of Orange and Deputy Petropulos.  The case proceeded to trial in April 2019, where Plaintiffs presented evidence to support their claims for (1) excessive force under 42 U.S.C. § 1983, (2) battery, (3) negligence, and (4) violation of the Bane Act, Cal. Civ. Code § 52.1(b).  After four days of trial, the jury returned a verdict in favor of Plaintiffs, finding Deputy Petropulos used excessive force.  (Dkt. 189.)  The trial proceeded to a second phase on damages.  The jury returned with a second verdict, awarding Plaintiffs a total of $3.4 million in damages.   (Dkt. 202.)

Before the Court are two post-trial motions: (1) Defendants' motion to alter the judgment to vacate the jury's award of damages for loss of life, and (2) Defendants' motion for judgment as a matter of law or, in the alternative, for a new trial.  (Dkts. 215, 216.)  For the following reasons, the motions are **DENIED**.[1]

## II.  BACKGROUND

On February 15, 2016, around 12:45 p.m., Orange County Sheriff's Deputy Nicholas Petropulos was on routine patrol at the Extended Stay America in Yorba Linda, California.[2]  He was not responding to any particular service call, but the area was known for narcotics use and transactions.  While on patrol at the hotel, Deputy Petropulos noticed an individual, who was later identified as Brandon Lee Witt.  Witt was sitting in a

---

[1]  Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for September 16, 2019 at 1:30 p.m. is hereby vacated and off calendar.

[2]  Defendants failed to provide any transcripts in support of their motion to alter judgment and motion for judgment as a matter of law or, in the alternative, for a new trial.  The Court's summary here is based on its recollection of the evidence at trial, which was largely consistent with the declarations and evidence that formed the basis of the Court's order granting in part and denying in part Defendants' motion for summary judgment.

vehicle in the parking lot and talking to a man who was standing outside the vehicle.  The vehicle had no front license plate.

When Deputy Petropulos's patrol car passed the two men, the man talking to Witt stared at Deputy Petropulos.  Deputy Petropulos drove to the front of the hotel parking lot to see if the men would leave.  When the men did not leave, he went back to the location in the parking lot where they had been.  By the time Deputy Petropulos returned, Witt had moved his vehicle to another parking space.  Deputy Petropulos parked his patrol car near Witt's vehicle.  Deputy Petropulos noticed that a woman had joined the man with whom Witt had been speaking, and the man and woman were now located a couple of parking spaces away.

Deputy Petropulos approached Witt's car.  Deputy Petropulos had never seen Witt before and he had no information about Witt's criminal history or whether he was on probation or parole.  Deputy Petropulos initiated a consensual encounter with Witt.  Deputy Petropulos's dash cam captured audio for the entirety of his conversation with Witt, although some portions are incomprehensible.  Deputy Petropulos approached Witt and asked him what he was doing.  Witt told Deputy Petropulos that he was in the middle of moving.  Deputy Petropulos then asked if Witt had any identification and whether he was on probation or parole.  Witt said he did not have any identification and that he was not on probation or parole.

Deputy Petropulos asked Witt whether he knew the man and woman in the parking lot.  Witt responded that he did not.  Deputy Petropulos told him to turn his car off.  Witt's car, a Toyota Avalon, was full of a myriad of items.  Deputy Petropulos asked Witt about the contents of the car: "Anything I need to worry about?"  Witt replied, "Not at all."  Deputy Petropulos repeated his command to turn the car off.  At that point, Witt displayed a pen-like metal tool, which was apparently used to manipulate the vehicle's

ignition.  Deputy Petropulos told him to drop it and step out of the car.  Witt placed the metal item on the center console near the gear shifter.  Deputy Petropulos asked Witt if the Toyota Avalon was his car.  Witt said it was.  Deputy Petropulos told Witt to keep his hands on the wheel.  Witt's response is inaudible on the recording.  Deputy Petropulos then said to him, "You had no front plate on the car when I looked at it earlier."  Witt responded, "It's right here. I had --."

Around that point, the woman in the parking lot approached Witt and asked for a baby bottle.  Deputy Petropulos said to her, "What?  Do you know him?  Any reason he would tell me he didn't know you a second ago?"  Her responses are inaudible.  Deputy Petropulos then turned to Witt, "Why would you lie, bro?"  Witt's responses are mostly inaudible.  Deputy Petropulos then said, "All right.  Do me a favor.  Open the door slowly.  I'm going to have you step out, man."  Witt asked Deputy Petropulos if he had a reason for this.  Deputy Petropulos responded, "Yes, I don't like the way you're acting right now.  I haven't confirmed your ID, anything like that.  I think you're lying to me."  Witt responded, "I can give you all the information you need."

Deputy Petropulos continued to ask Witt to step outside of the car.  Witt tried to explain that he had some incident with someone pretending to be a police officer about six months ago.  Witt asked Deputy Petropulos if he could verify his identity.  Deputy Petropulos responded, "You can step out of the car and do as you're told, man."  Witt told him he had no jurisdiction.  Deputy Petropulos replied that he was with the Orange County Sheriff's Department and they were in the city of Yorba Linda.  Witt asked if he could call Deputy Petropulos's sergeant.  Deputy Petropulos responded, "Get out of the car.  I'll get him here for you."  Deputy Petropulos then continued to ask Witt to keep his hands on the wheel and keep his hands outside of the car.  Witt said, "I'm going to call 911 and (inaudible) can I call your sergeant?  I'm going to call your sergeant."  At one point, Witt had a cell phone in his hand, but he dropped it when ordered by Deputy

Petropulos.  Deputy Petropulos ran Witt's license plate and it came back current for a four-door Toyota, registered to Brandon Witt out of Corona.

Deputy Petropulos then asked for Witt's name.  Witt gave him his full name, birthday, and social security number.  Deputy Petropulos then said, "You're (inaudible) how this is going right now."  Witt gave an inaudible response.  Deputy Petropulos then said, "I asked you to step out of the vehicle.  You're lucky that I haven't ripped you out right now."  Deputy Petropulos continued to tell Witt not to move his hands.  After some time, Witt repeated his earlier request for Deputy Petropulos to identify himself.  Deputy Petropulos responded with his name and badge number.  He told Witt, "They're coming right now."  The two continued to speak back and forth:

> DEPUTY PETROPULOS:  Put your hands over here.
> WITT:  Hey, there's no need to touch me like that.  Come on.  I --
> DEPUTY PETROPULOS:  You're reaching in --
> WITT:  (Inaudible.)
> DEPUTY PETROPULOS:  Dude, I swear to God.
> WITT:  Look, stop.  Why are you assaulting me?  Why are you assaulting me?  Come on, man.  Look, I stopped -- I stopped, all right.
> DEPUTY PETROPULOS:  104, I'm going to (inaudible) Code 3.[3]  I'm going to shoot you (inaudible).
> WITT:  No.
> DEPUTY PETROPULOS:  I'm going to fucking shoot you.  Put your hands outside of this fucking car.
> WITT:  Okay.  Let me get out -- let me get out -- let me get out.
> DEPUTY PETROPULOS:  Put your hands outside of the fucking car.
> WITT:  All right.  They're out.  They're out.  Let me get out.
> DEPUTY PETROPULOS:  You just tried to (inaudible).
> WITT:  No, I did not.  I swear -- I'm scared -- I'm scared.  Okay.  I'm scared.
> DEPUTY PETROPULOS:  I will shoot you if you throw that car in fucking drive again.
> WITT:  Okay.  All right.  I'm scared.

---

[3] "Code 3" means there is an emergency and the deputy needs assistance as soon as possible.

> DEPUTY PETROPULOS:  Just keep your hands outside the fucking window.
> WITT:  Officer --
> DEPUTY PETROPULOS:  You think I'm joking right now.
> WITT:  But I've been shot before, sir.
> DEPUTY PETROPULOS:  Okay.  I'm not going to shoot you as long as you fucking listen.
> WITT:  All right.  All right.  Yes, sir.  Can you ask the girl to tell -- tell you whatever information.
> DEPUTY PETROPULOS:  They're coming right now.
> WITT:  Okay, that's fine.  I'll stay right here.
> DEPUTY PETROPULOS:  Stay right there.  I'm not taking my hands off you.  Dude, keep your hands where I can fucking see them.

During this exchange, Deputy Petropulos placed his hands on Witt's wrists while they were outside the car, holding them there.  When Witt attempted to pull his arms and hands back into the vehicle, Deputy Petropulos maintained his grip and partially went inside the vehicle's open window.  Witt broke free of Petropulos's grip.  Deputy Petropulos leaned in through the open window, placed his right arm across Witt's body in a seatbelt-like fashion, and tried to gain control of Witt's right hand.  At some point during this struggle, Deputy Petropulos drew his firearm.

Another deputy, Brian Callagy, arrived at the scene in his patrol car.  Deputy Callagy noticed that the Toyota's reverse lights were on.  He parked so that his police car's front bumper touched Witt's car's rear bumper.  When Deputy Callagy arrived, Deputy Petropulos reholstered his gun.  Deputy Petropulos again reached into the vehicle.  He commanded Witt to put his car in park.  Deputy Callagy attempted to assist Deputy Petropulos in controlling Witt's hands.  The video footage shows Witt's vehicle moving forward and backward.  During the struggle, Witt yelled, "I've been assaulted -- I've been assaulted before."  Deputy Petropulos responded, "Stop fucking reaching around. You're going to get shot."  Deputy Petropulos then unholstered his gun and pointed it at Witt.  The conversation escalated:

> DEPUTY PETROPULOS:  You're going to get shot, motherfucker.
> WITT:  No, please.  Please, don't.
> DEPUTY PETROPULOS:  Put it in park.
> WITT:  Please don't (inaudible).
> DEPUTY PETROPULOS:  (Inaudible.)
> WITT:  I just been shot -- I been shot.
> DEPUTY PETROPULOS:  Put the car in park then -- in park and listen.
> WITT:  No, please, don't -- please.
> DEPUTY PETROPULOS:  I'm going to fucking --
> WITT:  (Inaudible.)

During this exchange, Witt's car moved back and forth as he apparently shifted the gear from reverse to drive and back again.

Then, Witt's car slowly moved five feet forward, away from the deputies, at about five miles per hour, causing Deputy Petropulos to collide with Deputy Callagy, and in turn causing Deputy Callagy to stumble and turn away.  When Deputy Callagy turned away, he saw nothing in Witt's right hand.  Deputy Petropulos could see Witt's left hand on the steering wheel, but Witt's right hand apparently went out of Deputy Petropulos's view for two to five seconds.  Deputy Petropulos was standing beside the vehicle, not in front of it or in its direct path.  Deputy Petropulos testified that he thought Witt was reaching for a weapon.  Deputy Petropulos, however, had not seen any weapon in the eight to nine minutes that he was speaking with Witt, and he had no information that Witt was armed.  Deputy Petropulos said, "Fuck it."  He then fired one round at Witt, striking him in the chest.

The car moved forward into the bushes and came to a stop in a drainage area.  The tires kept spinning, burning rubber and creating smoke.  Deputies Petropulos and Callagy kept their distance.  After the smoke cleared and backup deputies arrived, Witt was removed from the vehicle.  The deputies initiated first aid, and paramedics arrived shortly thereafter.  Witt died as a result of the gunshot.

On March 17, 2017, Plaintiffs Gary Craig and Kathy Craig, Witt's biological parents, filed this action against Defendants County of Orange and Deputy Petropulos in federal court.  (Dkt. 1.)  Plaintiffs asserted causes of action for (1) unreasonable detention, (2) excessive force, (3) violation of substantive due process, (4) battery, (5) negligence, and (6) violation of the Bane Act, Cal. Civ. Code § 52.1(b).[4]  (*See* Dkt. 37 [Third Amended Complaint].)  The Court granted summary judgment to Defendants on the unreasonable detention claim.  (Dkt. 92.)  Plaintiffs proceeded to trial on their excessive force, battery, negligence, and Bane Act claims.[5]

On April 23, 2019, the court impaneled a jury.  Trial proceeded in two phases. After four days of trial, the jury returned a verdict in favor of Plaintiffs on the question of liability.  The jury found that Deputy Petropulos used excessive or unreasonable force against Witt and that Deputy Petropulos violated Witt's rights under California Civil Code § 52.1.  (Dkt. 189.)  The jury also found that Witt was contributorily negligent during the incident.  (*Id.*)  The jury assigned 60% of fault to Deputy Petropulos and 40% of fault to Witt.  (*Id.*)  Lastly, the jury found that Deputy Petropulos acted with malice, oppression, or in reckless disregard of Witt's rights.  (*Id.*)

Next, the second phase of the trial proceeded on the question of damages.  Since the jury found that Deputy Petropulos acted with malice, oppression, or in reckless disregard of Witt's rights, the jury heard evidence relevant to determining an award of punitive damages, including information regarding Deputy Petropulos's financial circumstances and ability to pay.  The jury also heard evidence regarding Plaintiffs' relationship with Witt.  The jury returned a verdict awarding survival damages of $1,800,000 for Witt's loss of life and $200,000 for Witt's pre-death pain and suffering.

---

[4]  Plaintiffs voluntarily dismissed their claims for denial of medical care and *Monell* liability under 42 U.S.C. § 1983.  (Dkt. 75.)

[5]  Plaintiffs did not proceed to trial on their substantive due process claim.

(Dkt. 202.)  The jury also awarded $700,000 each to both Plaintiffs for wrongful death damages for their past loss of Witt's love, companionship, comfort, care, training, education, protection, affection, society, and moral support.  (*Id.*)  The jury awarded $0 in punitive damages against Deputy Petropulos.  (*Id.*)

## III.  DAMAGES FOR LOSS OF LIFE UNDER 42 U.S.C. § 1983

Defendants first ask this Court to alter the judgment under Federal Rule of Civil Procedure 59(e) and vacate the jury's award of $1,800,000 for Witt's loss of life.  (Dkt. 216.)  Because California law bars recovery for a decedent's loss of life, Defendants argue the Court should vacate that portion of the jury's award.  But doing so would undermine the vital constitutional right against excessive force.  Perversely, it would incentivize officers to aim to kill a suspect, rather than just harm him.

Because federal law is silent on the measure of damages in § 1983 actions, state law governs unless it is inconsistent with the policies of § 1983.  *See* 42 U.S.C. § 1988; *Robertson v. Wegmann*, 436 U.S. 584, 589–90 (1978).  California law does not allow a decedent's estate to recover for the decedent's loss of life.  Cal. Civ. Proc. Code § 377.34. Instead, state law limits recovery to pre-death economic damages in an action brought by a decedent's successor-in-interest.  *Id.*

A primary goal driving Congress's enactment of § 1983 was to provide for killings unconstitutionally caused or acquiesced in by state governments.  *See Monroe v. Pape*, 365 U.S. 167, 172–76 (1961), *overruled in part on other grounds by Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 690 (1978).  There are two policies underlying § 1983: (1) to compensate persons injured by the deprivation of federal rights and (2) to prevent abuses of power by those acting under color of state law.  *Robertson*, 436 U.S. at 590–91.  Whether California's bar on loss of life damages applies in § 1983 actions

depends on whether this limit is inconsistent with § 1983's twin goals of compensation and deterrence.  *See id.* at 591–92.

Neither the Supreme Court nor the Ninth Circuit has addressed this issue directly. The Ninth Circuit came closest to the question in *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014).  The court there considered whether California's bar on survival damages for pre-death pain and suffering was inconsistent with § 1983. *Chaudhry*, 751 F.3d at 1103.  It held that it was.  By limiting damages in survival actions to the victim's pre-death economic losses, "[t]he practical effect of [California Code of Civil Procedure] § 377.34 is to reduce, and often to eliminate, compensatory damage awards for the survivors of people killed by violations of federal law."  *Id.* at 1104.  In cases where the victim dies quickly, there will often be no remedy at all.  *Id.*  And "[e]ven in cases of slow death where pre-death economic damages might be available, § 377.34's limitation will often be tantamount to a prohibition, for the victims of excessive police force are often low-paid or unemployed."  *Id.*  A prohibition against pre-death pain and suffering creates a perverse effect: it is more economically advantageous for a defendant to kill rather than injure his victim.  *Id.*  California's prohibition against pre-death pain and suffering damages thus limits recovery too severely to be consistent with § 1983's deterrence policy.  *Id.* at 1105.

*Chaudhry* cited with approval an out-of-circuit decision, *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984).  *Bell* held that a Wisconsin statute barring damages for loss of life was inconsistent with § 1983.  *Id.* at 1239, *overruled in part on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005).  In that case, a Milwaukee police officer shot and killed the decedent, planted a knife on his body, and then lied about the circumstances of the killing.  *Id.* at 1215–18.  The decedent's siblings and estate sued under § 1983.  In rejecting a Wisconsin law precluding recovery of damages for loss of life in survival actions, *Bell* concluded that "if Section 1983 did not allow recovery for

loss of life notwithstanding inhospitable state law, deterrence would be further subverted since it would be more advantageous to the unlawful actor to kill rather than injure." *Id.* at 1239.

Other courts have reached the same conclusion.  The majority of California district courts considering the issue have held that § 377.34's bar on loss of life damages is inconsistent with the policies of § 1983.  *See, e.g.*, *T.D.W. v. Riverside Cty.*, 2009 WL 2252072, at *7 (C.D. Cal. July 27, 2009) (finding excluding damages for loss of enjoyment of life would be inconsistent with the purposes of § 1983); *Guyton v. Phillips*, 532 F. Supp. 1154, 1167–68 (N.D. Cal. 1981) (finding § 1983's deterrent purpose "is hardly served when the police officer who acts without substantial justification suffers a harsher penalty for injuring or maiming a victim than for killing him"); *see also Thomas v. Cannon*, 2017 WL 2954920, at *3 (W.D. Wash. July 10, 2017) (finding Washington's limit on damages for loss of life was inconsistent with § 1983's policies). And since *Chaudhry*, no court has held otherwise.  *See Estate of Casillas v. City of Fresno*, 2019 WL 2869079, at *16 (E.D. Cal. July 3, 2019) (collecting cases).

The Court agrees with the weight of authority holding that California's bar on loss of life damages is inconsistent with the policies behind § 1983.  Foreclosing recovery for loss of life creates a perverse incentive: officers should aim to kill, not injure.  Even more, they should kill quickly, lest the decedent's estate recovers damages for pre-death pain and suffering, now available under *Chaudhry*.  Incentivizing the use of executioner-style force is clearly inconsistent with § 1983's policy of deterrence.  It also trivializes our fundamental right against excessive force.  The Constitution demands more from those entrusted by the government to use deadly force.  They must do so only when necessary to protect themselves and others from serious physical injury.

Damages for loss of life also provide compensation for individuals killed by a violation of their constitutional rights. Every life has a value. This platitude rings true even if someone is unemployed, homeless, or broke. In the name of tort reform, California law subverts this principle by limiting damages in survival actions to the victim's pre-death economic losses. Consider how this limit impacts § 1983 actions where an officer unjustifiably used deadly force. Victims of excessive force are often low paid or unemployed. They are more likely to be persons of color, and thus statistically likely to be paid less on the dollar. These lives have worth beyond economic loss. Barring recovery for the innate value of a life, particularly where an officer has killed someone, conflicts with § 1983's policy of compensation.

Defendants contend that allowing loss of life damages creates "insurmountable" trial and pretrial issues, mainly because it is difficult to place a monetary value on a human life. It is indeed difficult—and uncomfortable—to assign a dollar value to an individual's life. But it is absolutely necessary that juries do so. It is the responsibility of the justice system to ensure there is compensation for wrongs, particularly a wrong so egregious as to have unnecessarily cost someone his life. Juries are frequently challenged to assign values where there is no clear formula or metric.[6] Justice does not shy away from difficult questions.

Lastly, Defendants argue that awarding damages for loss of life provides double recovery. Defendants claim that awarding $1,800,000 to Witt's estate in loss of life damages, when the jury also awarded Plaintiffs $1,400,000 on their own state law wrongful death claims, amounts to impermissible double recovery because Plaintiffs

---

[6] Defendants also argue that allowing recovery for loss of life contradicts *Memphis Community School District v. Stachura*, where the Supreme Court held "the abstract value of a constitutional right may not form the basis for § 1983 damages." *See* 477 U.S. 299, 308 (1986). Not so. Assigning a value for loss of life does not require the jury to discern the amorphous value of a constitutional right. It is a compensatory award arising from the concrete loss of a person's life.

receive both.  However, there is no double recovery here because these are separate injuries: one award provides compensation to Witt's estate for his loss of life, and one award provides compensation to Plaintiffs for their own personal loss from the death of their son.

It would be a great injustice to allow a perpetrator of excessive force to get away with paying no damages, so long as the victim is dead and penniless.  Loss of life damages are necessary to promote the important policies underlying § 1983 and the fundamental American value that every life matters.  Defendants' motion to alter the judgment and vacate damages for loss of life is **DENIED**.[7]

## IV.  JUDGMENT AS MATTER OF LAW AND NEW TRIAL

Defendants also move for judgment as a matter of law.  (Dkt. 215.)  A court may enter judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [prevailing] party" as to an issue on which that party has been fully heard during trial.  Fed. R. Civ. P. 50(a)–(b).  A party seeking judgment as a matter of law has a "very high" standard to meet.  *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002).  The jury's verdict must be upheld if, viewing the facts in the light most favorable to the nonmoving party, there is substantial evidence for a reasonable jury to have found in the nonmoving party's favor.  *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).  When considering the motion, the court must draw all reasonable inferences in favor of the nonmoving party,

---

[7]  Defendants also argue that Plaintiffs did not request damages for loss of life in the Third Amended Complaint.  This argument has no merit.  In their Prayer for Relief, Plaintiffs requested "compensatory damages, including wrongful death and survival damages, under federal and state law."  (Dkt. 37 [Third Amended Complaint].)  As the Court previously concluded, damages for loss of life are survival damages available under federal law.

and it may not make credibility determinations or weigh the evidence.  *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015).

In the alternative, Defendants move for a new trial.  After a jury trial, a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "[E]ven if substantial evidence supports the jury's verdict, a trial court may grant a new trial if 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'"  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)).

## A.    Excessive Force

Defendants argue that they are entitled to judgment as a matter of law or a new trial because Deputy Petropulos's conduct was reasonable.  Under the Fourth Amendment, a police officer over may use only such force as is "objectively reasonable" under all of the circumstances.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  "The 'reasonableness' of a particular use of force [is] judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).  Factfinders assess reasonableness using the nonexhaustive *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  The most important factor is whether the suspect posed an immediate threat.  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).  Deadly force is reasonable if "the officer has probable cause to believe that the suspect poses a threat of

serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

There was substantial evidence to support the jury's finding that Deputy Petropulos used excessive force.  When Deputy Petropulos approached Witt in the parking lot, he had no information that Witt had committed any crime.  Deputy Petropulos testified that he never saw any weapons, a gun, or anything that looked like a gun on Witt's person at any time during the incident.  The only items that Deputy Petropulos ever saw in Witt's hands were a cell phone and a metal tool for starting the car, both of which Witt dropped when ordered to do so.  Witt spoke respectfully, never used any profanity, and never threatened anyone.  He tried multiple times to explain about a prior incident that caused him to fear law enforcement.  Deputy Petropulos, in contrast, grew increasingly agitated. He started yelling and grabbed Witt's arms.  He drew his firearm and repeatedly yelled he was going to "fucking shoot" Witt.  In these moments, the recording captures Witt pleading for his life: "No, please.  Please don't."  It was only after Deputy Petropulos threatened to shoot that Witt placed his hand on the gear shifter, presumably to get away from the deputy threatening to shoot him.  Deputy Petropulos testified that Witt's hands never went out of his view for the first eight to nine minutes of the encounter.  In fact, just before the shooting, Witt's car began rolling slowly away from the officers.  A jury could reasonably find that Witt did not pose an immediate threat and that there was absolutely no need to shoot him.

Nor was the jury's verdict against the clear weight of the evidence.  There was ample evidence that a reasonable officer would not have seen Witt as a threat.  Deputy Callagy never even drew his gun.  When Deputy Petropulos shot Witt, Witt's car was slowly rolling away from the officers.  Deputy Petropulos never saw a weapon and had no reason to believe Witt was armed.  Witt never made any threats.  The recording captures the gravity and tragedy of the Witt's final moments.  Witt, anxious but polite,

pleaded for his life, saying "please" and referring to the officer as "sir."  Deputy
Petropulos muttered, "Fuck it."  He then fired a bullet at Witt through the window of the
moving car.

### B.    Bane Act, Cal. Civ. Code § 52.1

Defendants argue they are entitled to judgment as a matter of law or a new trial on
Plaintiffs' Bane Act claim because there was no evidence that Deputy Petropulos had the
specific intent to violate Witt's rights.  Although the elements of an excessive force claim
under the Bane Act are similar to those under § 1983, the Bane Act requires an additional
element of specific intent.  *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1044–45 (9th
Cir. 2018).  To violate the Bane Act, the defendants must have "intended not only the
force, but its unreasonableness, its character as more than necessary under the
circumstances."  *Id.* at 1045 (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir.
1993)) (internal quotation marks omitted).  There does not need to be proof that the
defendants were "thinking in constitutional or legal terms at the time of the incidents."
*Id.* (quoting *Reese*, 2 F.3d at 870) (emphasis omitted).  "[A] reckless disregard for a
person's constitutional rights is evidence of a specific intent to deprive that person of
those rights."  *Id.* (quoting *Reese*, 2 F.3d at 870)).

Contrary to Defendant's assertion, there was substantial evidence that Deputy
Petropulos had a specific intent to violate Witt's rights.  Deputy Petropulos testified that
he held the gun as close to Witt's chest as possible, about six inches away.  He also
testified that he knew his shot was likely to kill.  At the time of the shooting, Witt had
committed, at most, a drug misdemeanor or a traffic violation, and he never threatened
either deputy.  In the minute before Deputy Petropulos fired the shot, Witt was begging
not be shot and asking to be let out of the car.  The recording captures how Deputy
Petropulos grew impatient, raised his voice, and threatened to rip Witt out of the car and

shoot him.  A jury could reasonably conclude that Deputy Petropulos intended to deprive Witt of his right against excessive force, just because Witt was challenging the deputy's authority and failing to comply with all his commands.

And the jury's verdict is not against the clear weight of the evidence.  Deputy Petropulos's own words provide evidence of his intent, as he told Witt, "I will shoot you if you throw that car in drive again," "I'm not going to shoot you as long as you fucking listen," "You're going to get shot motherfucker," and "Fuck it," before pulling the trigger.  The recording and evidence at trial indicates Deputy Petropulos was not responding to any real threat.  He shot Witt out of anger and frustration.

## C.    Qualified Immunity

Deputy Petropulos contends he is entitled to judgment as a matter of law on Plaintiffs' § 1983 claim on the basis of qualified immunity.  Qualified immunity shields public employees from civil liability under § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether a public employee is entitled to qualified immunity, courts evaluate two independent questions: (1) whether the employee's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  As discussed above, there was substantial evidence to support the jury's finding that Deputy Petropulos violated Witt's constitutional rights by using excessive force.  In the specific circumstance here, it was unreasonable for Deputy Petropulos to shoot Witt when he reached down in the car, as Deputy Petropulos had no information that Witt was armed or dangerous, he had not seen a weapon, and the vehicle was slowly moving away from the officers.

"To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood *what he is doing* violates that right." *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016) (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015)) (per curiam) (emphasis in *Hamby*). "Although a plaintiff need not find 'a case directly on point, existing precedent must have placed the . . . constitutional question beyond debate.'" *Id.* at 1091 (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2001)). The Court must make its inquiry "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

It was clearly established on February 15, 2016 that deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. The evidence at trial paralleled the circumstances in *Haugen v. Brosseau*, 351 F.3d 372 (9th Cir. 2003), *rev'd on other grounds*, 543 U.S. 194 (2004). In *Haugen*, a police officer shot a suspect through the window of a car as he appeared to reach for something. *Id.* at 383. *Haugen* held that "[m]ovements by a suspect are not enough to justify deadly force if, in light of the relevant circumstances, those movements would not cause a reasonable officer to believe that the suspect was reaching for a weapon." *Id.* Based on *Haugen*, a reasonable officer would have understood that it was objectively unreasonable to shoot Witt because he appeared to reach for something in the car, when the circumstances would not cause a reasonable officer to believe that Witt was reaching for a weapon.

*Haugen* is not the only case on point. Courts have repeatedly held that it is not objectively reasonable to use deadly force where decedents did not have weapons on their persons, brandish weapons, or threaten to use them. *See Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) (holding a shooting was not objectively reasonable where suspect was attempting to flee officers and made "no threatening movement of any kind"); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (finding it was

clearly established law that officers could not use deadly force to shoot a suspect who was not pointing a gun at the officers and was not facing them).

And this is not just a case where an officer acted unreasonably.  The jury here made an explicit finding that Deputy Petropulos *intended* to deprive Witt of his constitutional rights and *acted with malice* towards Witt's rights.  Any reasonable officer would know that you cannot shoot a suspect just because he is challenging your authority and not obeying your commands.  *See, e.g.*, *Porter v. Osborn*, 546 F.3d 1131, 1140–41 (9th Cir. 2008) (finding an officer who uses force against a suspect to "teach him a lesson" or "get even" violates the Constitution).

### D.      Conduct Warranting Punitive Damages

Defendants argue the Court should vacate the jury's finding that Deputy Petropulos acted with malice, oppression, or in reckless disregard of Witt's rights.  First, Defendants contend this finding is inconsistent with the jury's finding that Witt was 40% at fault.  Defendants, however, cite no authority for the proposition that an attribution of comparative negligence is inconsistent with a finding that Deputy Petropulos acted with malice, oppression, or in reckless disregard of Witt's rights under federal law.  The fact that Witt was negligent does not preclude Deputy Petropulos from acting maliciously.  The findings also relate to different measures of damages.  Unlike compensatory damages, punitive damages under federal law are not intended to compensate plaintiffs for their loss.  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 490–93 (2008) (noting that punitive damages are "separate and distinct from compensatory damages" and aimed "principally at retribution and harmful conduct").

Second, Defendants contend the jury's award of $0 in punitive damages in the second phase is inconsistent its finding in the first phase that Deputy Petropulos acted

with malice, oppression, or in reckless disregard of Witt's rights.  There is no inconsistency.  The first phase of the trial focused on Deputy Petropulos's conduct during the incident.  There was substantial evidence that Deputy Petropulos acted with malice or oppression towards Witt's rights.  The recording captures the deeply troubling moments leading up to the shooting, as Witt pleaded for his life in the face of Deputy Petropulos's escalating temper and profanity-laced threats.  In the second phase, however, the jury heard evidence that Deputy Petropulos is the sole provider for his young family, that he has no other sources of income, and that his salary varies significantly based on whether he works overtime.  The jury also heard evidence regarding Deputy Petropulos's mortgage, his monthly bills, his assets, and his debt.  The Court then instructed the jury to consider Deputy Petropulos's ability to pay as a factor in determining the amount of punitive damages to award.  (Dkt. 198 [Part II Supplemental Jury Instructions] No. 2.) The jury could have reasonably concluded that even though Deputy Petropulos's conduct warranted punitive damages, he had little or no money to pay a punitive damages award.

Since this verdict is not against the clear weight of the evidence, the Court also declines to grant a new trial.  If anything, this result stems from Defendants' own trial strategy.  It was Defendants who requested that punitive damages be bifurcated into two phases.  And when the first phase concluded, after the jury found punitive damages were warranted, Defendants requested a punitive damages jury instruction that told the jury that it must decide the amount of punitive damages to award "*if any*."  (*See id.*)  It would be unjust to allow Defendants to use this now as a basis to amend the judgment or to seek a new trial.

//

### E.      Admission of Evidence

Defendants argue the Court should grant a new trial because it erroneously admitted certain evidence.  None of these asserted issues suggest error, much less grounds for a new trial.  The Court previously analyzed many of these issues in its pretrial order addressing the parties' motions in limine.  (*See* Dkt. 159.)

First, Defendants contend that the Court should have excluded as irrelevant evidence that Witt was subsequently determined to be unarmed.  This evidence, however, was highly relevant to determining the credibility of the deputies.  Deputy Petropulos testified that he thought Witt was reaching for a gun near the floorboard of his car and that he believed Witt was going to turn and fire on him.  Plaintiffs contested whether Deputy Petropulos's belief was sincere or reasonable.  Plaintiffs presented evidence that Deputy Petropulos never saw a gun, had no information that Witt was armed or dangerous, and had not been threatened by Witt.  The fact that Witt was unarmed makes it less likely that Deputy Petropulos actually or reasonably believed Witt was reaching for a gun.  *See Boyd v. City & Cty. of S.F.*, 576 F.3d 938, 944 (9th Cir. 2009) (stating that a factfinder may consider outside evidence "in assessing the credibility of an officer's account of the circumstances that prompted the use of force" (quoting *Graham*, 490 U.S. at 399 n.12)).

Defendants assert that *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014), required the Court to exclude this evidence.  As discussed previously in the Court's April 15, 2019 Order, Defendants' citation to *Cruz* is unpersuasive.  Defendants, again, mischaracterize *Cruz*.  Because the relevant inquiry on an excessive force claim is the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight, the Ninth Circuit noted that "the fact that Cruz did not have a gun on him normally wouldn't factor into the reasonableness analysis because the officers couldn't know what

was (or wasn't) underneath Cruz's waistband." *Cruz*, 765 F.3d at 1079 n.3.  But, because the officers killed Cruz, the Ninth Circuit clarified that a factfinder "must examine whether the officers' accounts are 'consistent with other known facts,'" including the fact that no gun was found on Cruz.  *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  *Cruz* thus stands for the opposite of Defendants' assertion.  Here, like *Cruz*, Witt was killed and Deputy Petropulos testified he thought Witt was reaching for a gun.  The fact that Witt was unarmed is relevant to assessing the credibility of Deputy Petropulos's account.

Second, Defendants argue the Court erred by admitting five "gruesome" post-death photographs of Witt.  Defendants contend these photographs have no probative value.  To the contrary, these photographs were relevant as evidence of Witt's pre-death pain and suffering, since they indicated Witt's wounds.  The Court also does not find that the photographs were unduly prejudicial.  The three hospital photos and two autopsy photos were a small portion of the forty-nine hospital photos and eighty-five autopsy photos that Defendants produced in discovery.  None of the photos were unnecessarily bloody, and none showed any part of Witt's body other than the gunshot wounds.

Third, Defendants assert the Court erred by allowing testimony from William Krone, Plaintiffs' expert in forensic video analysis.  Krone prepared a combined audio and video file of the incident using footage from the deputies' two dash cams.  Defendants argue the Court should have excluded Krone's testimony under Federal Rule of Civil Procedure 37 because his testimony exceeded his Rule 26 report.  To the contrary, Krone's Rule 26 expert report adequately describes how he used Sony Vegas Pro editing software to prepare the combined audio and video footage of the incident.  The Court has reviewed both the original and the enhanced footage, and it has found no evidence that Krone combined or edited the video in a misleading way.  Defendants also have failed to establish any prejudice regarding any purported omission in Krone's expert

report.  Defendants further argue that Krone rendered substantial testimony regarding what he heard and saw in the videos of the incident, contrary to this Court's April 15, 2019 Order.  Yet Defendants offer no citations to the record and completely fail to submit any trial transcripts in support of their motion.  In any event, by the time Krone testified, the jurors had already had an opportunity to see, hear, evaluate, and draw conclusions from the footage on their own.

Simply put, Defendants fail to identify any basis justifying judgment as a matter of law or grounds for a new trial.  Defendants' motion for judgment as matter of law or for a new trial is **DENIED**.[8]

## V.  CONCLUSION

Defendants' motion to alter the judgment to vacate the jury's award for loss of life is **DENIED**.  California's prohibition on damages for loss of life is inconsistent with the policies of 42 U.S.C. § 1983.  For the reasons stated above, Defendants' motion for judgment as a matter of law or, in the alternative, for a new trial is **DENIED**.

DATED:      September 5, 2019

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[8]  Defendants also assert there are grounds for a new trial because the Court erred by allowing the jury to award damages for loss of life.  As discussed in Part III, it was not error to allow recovery for Witt's loss of life.